Good morning, Your Honors. May it please the Court. My name is Joseph Meany, and I represent Plaintiff Appellant Merit Homes. I'd like to reserve three minutes for rebuttal. The District Court erred and should be reversed because no collateral held as a security interest prior to default transfers automatically to the bank simply because the blank bank declares default. We know this because Arizona has adopted revised Article 9 of the Uniform Commercial Code. By express statement, Article 9 applies to any transaction, regardless of form, that creates a security interest by contract. A security interest is any interest that secures payment or performance of an obligation. Here, the bank held a collateral interest in the plans and specs as security for the borrower's performance under the construction law. Therefore, by statute, Article 9 governs the bank's security interest in the architectural plans and drawings. Can I ask you this? I mean, you would concede, I assume, that the trustee thought that everything that he, right, the trustee? The trustee. Everything that he took possession of was being sold at the foreclosure sale, right? It's hard. The record doesn't say what the trustee thought. Well, but the trustee did collect documents and things. But collecting documents and things does not comply with. Then the final accounting, the trustee says, hey, fantastic. I've sold. The sales occurred. I'm done. Please close this out. Goodbye, right? So you would kind of think that the trustee doesn't think he's still holding on to the collateral at that point. I don't. I disagree, Your Honor. I think I would refer you to the trustee's final accounting. If you look at the trustee's final accounting, I think that's. . . I'm looking at a page marked V2. I don't know what that corresponds to in the ER. Well, the trustee has a final accounting. Let me see if I can put my hands on that. Because the trustee does not say that he's disposing of the collateral. The trustee says that he acquires the collateral. And then at the end, the trustee says, well, we've sold the real property. It mentions nothing of the collateral. So there was no sale. Hang on. But you agree that the trustee took possession of the collateral? Yes. Okay. So what the thing says is after that sale of the real property occurs, it says, the secured creditor foreclosed and took title of the property, thereby terminating the receivership. The receiver hereby requests to be discharged and for its bond to be exonerated. So the trustee thinks, I'm done. I don't have any more property to dispose of, right? Right. I don't have any more property. And I did not dispose of the collateral. But if he didn't dispose of the collateral, that's what I'm saying, if he didn't dispose of the collateral at the foreclosure sale, then he would still have it, wouldn't he? Sure. He did. But he had the collateral. He says in the final accounting, I don't have any more property. Please discharge me. I'm done. I guess I just am saying, I agree with you that the notice didn't specify that, right? I'm with you on that. But I'm just saying in terms of what the trustee and seemingly everyone else thought had happened as a result of that sale, is that the plans and the specifications went with that? Well, I don't think anybody else thought that's what happened. I think if you're going to read it that way, if I had to put my hands on it, I would disagree. But I don't think he has it. That's a fair reading. But you know what? I think the difficulty that I have with this case is that there was really the underlying documents and records that the parties cite to and refer to really didn't have that level of specificity. So I guess we have to look at the record and say, okay, well, what's the best reading of this? You've got notice of trustee sale, trustee's deed, the final accounting report, the order approving receivers, final report. None of those documents really specifically reference collateral. But as Judge Watford pointed out, the receiver did take possession of everything and the case got closed out and the receivership was terminated. Well, Article 9 controls here. And Article 9 specifies four ways that you can dispose of collateral. And none of the – and collecting collateral is not one of those ways. Four ways. I don't actually understand why you even need to get there and educate me in case – because I must be confused. I look at the construction, deed of trust, assignment of rent, security agreement and financing statement at JCH, a bunch of zeros, and then 6. CC1, sort of like a – it's in Excerpts of Record, Volume 2. And when I get over to page 53 of that document, DD53, it says that the borrower collaterally transfers and assigns to the lender all of borrower's right, title and interest to the plans. And it provides a whole lot of details about the plans. And then it says in subsection 3, lender may use the plans and specifications for any purpose relating to the improvements, including completion of the improvements. I don't understand why they need any more. It seems like an express assignment and license. Well, the – well, that language is prior to default. So in other words, when they're securing their collateral, when they're securing their interest – But it seems to say all they need is a default. And then they can, at their election, complete and their assignees of the plans and licensees. Okay. So in default, they would have the right to complete construction. One, they didn't – they didn't accept that right. That's an option. And they didn't actually take over and complete the construction. They elected to do two other things. They elected to foreclose and they elected to file a lawsuit. It says that they can also assign their rights to somebody else to do it, I believe. They could. But that's true. But they didn't do that. They didn't assign the right to anybody else. They elected to foreclose the real property and they elected to – I thought they did to Joseph Carl Holmes. No, they didn't. If you look at – if you look at the transfer first to Brimitt, the transfer is just of the real property and there was some personal property at the back. If there was – otherwise, it was an as-is, we're representing nothing. They don't say you have the right to complete construction that Arboleda Ranch was pursuing. They just say here's the real property. And the other reason why it can't be construed that way is because Article 9 requires that any secured party has to follow the procedures. And that's found in Arizona 47-9602, which expressly states, to the extent that the rules impose duties on a secured party in favor of a debtor, the debtor may not waive or vary the rules stated in the following sections. So in other words, you can't use the right to complete construction as a Trojan horse. Okay, we have the right to complete construction. So let's load up all the collateral, you know, just under that right and then bypass Article 9. You still have to foreclose the collateral. Article 9 requires you to do that. What about – okay, if it's not an express license, what about an implied license? Because Merritt was a member of Arboleda Ranch, right, guaranteed the loan in this case. Can we construe the loan documents as Merritt's granting of an implied license to NBA such that in the event of a default, NBA is going to take over and complete that project? You can construe it that way, that they had the right to do that, but they still have to – they still have to exercise that right. And we know they didn't exercise that right. We know that they gave up that right, and that's – that's the settlement agreement at N-1. N-1 is a single-page settlement agreement. That settlement agreement occurred at the eve of the bankruptcy cutoff. In other words, the night before the trustees' sale, Merritt had claims against the bank for improper declaration of default, and the bank had interest in acquiring the real property. And so both parties gave up some claims. The bank gave up the right to complete construction. The bank gave up the right to pursue any more collateral in exchange for Merritt Holmes' promise not to declare bankruptcy and allow the sale of the real property and the real property only to go through. Therefore, N-1 is really the only document you need to see. This effectuates the parties' agreement. And – and like in any agreement, one party gets something, the other party gets one thing, one party gives up something, the other party gives up something. And so the agreement's very simple. Arboleda Ranch does not file a petition for bankruptcy as for the real property. After that, the parties release each other of all claims. So this settlement agreement, which occurred right before the trustees' sale, that evidences what the parties agreed. After that, things are kind of ambiguous as respect to, you know, some settlement agreement that occurred later and also the transfer to Brimit occurred after N-1. And – and to the extent that they are, we need to look at N-1 as the parties' settlement. That was the settlement between bank and Merritt. And that really shines a light on – on all the facts that come after and all the facts that come before it don't matter. It doesn't – What am I missing here about the UCC? It looks like section 610, that's 47 Arizona law 9610, says, After default, a secured party may sell, lease, license, or otherwise dispose of any or all of the collateral in its present condition or following any commercially reasonable preparation or processing. Why wasn't their transfer to Joseph Carl Holmes such a sale? It was not a sale because there's other procedures in – in that chapter that require notice of – in advance of this sale. And that triggers other rights for the debtor to perhaps take other measures. And that wasn't to – Well, they don't have all the protection – the debtor doesn't have all the protections on personal property that the debtor has on real property. What – I – I'm not sure that notice – what is the notice requirement exactly? The notice provision of any sale is found – that's 479613, Contents in form of notification before disposition of collateral. Those steps weren't taken. And – and – and the bank needs to acquire – if the bank's going to sell the collateral to somebody else, the bank needs to acquire it first. The collateral stays in the absence of – of taking steps under Article 9. The collateral stays in the possession of the debtor until – until something happens. And that – that's the whole – that's the whole rationale behind 9602. Let me ask you a different question because your time is running short. Let's say we agreed with you that the foreclosure sale wasn't effective, that this implied license theory that the district court relied on doesn't work. But why – why couldn't – I'm forgetting the initials – the defendant here. Why couldn't the defendant have acquired directly from Felton a non-exclusive license? Why – what's the problem with that theory? They paid for it. The problem with that theory is, is because contractually, Felton agreed to co-own the – the plans with my client, Merritt Holmes. Okay. So maybe – maybe you have a breach of contract action against Felton. Maybe you have a tortious interference action against the defendant. But why do you have a copyright infringement action? I mean, they did acquire a license from Felton. Because – because the next – the next sentence of that – of that agreement between us and Felton says that deprives them of the right to license anyone without our permission. In other words, they contractually gave away the right to unilaterally license JCH. They said that we have the right to preclude or we – they will – I can't even remember the exact line. In effect, right below what you're – where you're talking, it says that – that basically my client has the right to prevent them from working with anyone else. They will not work with any other entity, and JCH is another entity. So in other words, contractually, they didn't have the right to unilaterally license it to anyone else without our permission. But I thought our – I thought we had case law. It might go back a little ways. I thought we had case law that said in this circumstance, as long as – as long as the other party is dealing with a co-owner of the copyright, that person has the authority to grant a nonexclusive license. Now, it may well have breached a contractual obligation to you. The acquirer of the license may well have tortiously interfered with your contractual rights, but in terms of a copyright infringement action, they now have a defense to that, and that's really the only claim that's before us. I think we would also have a breach of contract claim, but I – but those cases, I believe, are talking about when there is no restriction on transfer. There's a restriction on transfer, and the defendant knew it. And I believe there is a case that says when the – when the defendant – when the other party, the third party, has knowledge that they don't have the right to transfer, then they're not allowed to then take it. I'm not – I'm not sure that the premise of what you're arguing is right. I think the law is pretty clear that the architect remains the sole owner of the copyright, and the original developer just had rights with regard to the use of the plans. Most importantly, that the architect would not reuse and or present the documents to any other entity or business without the written consent of the client. It says right here that, let's see, F.G. retains an ownership and property interest. And I think that was the architect. And clients shall not reuse the documents without written permission. I think all that is taken care of by the assignment to the bank. So the bank steps into the developer's shoes once the developer defaults, and then the bank can give the permissions. That could have happened, Your Honor. The bank did have the right to do that. But the bank did not exercise that right. The bank chose to exercise two other rights, which was judicial foreclosure and a deficiency debt. I thought it exercised the right by making a deal with Joseph Carl Holmes to finish up this development. They didn't make that deal, Your Honor. There is no transfer of any copyright. There is no discussion of any copyright. There is no discussion of any right to continue the development. All there was was a transfer of real property to Brimit, which was an interim party, and then Brimit, in some kind of quick claim with respect to the copyrights, said whatever rights we have, you can have, which were none, gave the option to Joseph Carl Holmes to finish. So there never was any transfer of these rights. I think what you said originally was correct. By default, the architect does own the copyrights. And that's why Joseph Carl Holmes never expected it had the copyrights, because they knew and they did. But they, as I remember, they, the original developer had not paid the bill. Well, they did not pay the complete bill. And Joseph Carl Holmes paid the rest of the bill to the architect, and the architect gave Joseph Carl Holmes the right to finish the development according to its floor  Well, they did make a deal based on a presumption that, that, or based on Joseph Carl Holmes' representation that they acquired the plans in foreclosure. That's not true. That's what they told the architect in order to get the architect's permission. Otherwise, the architect said, we're not working with you unless you get Merit's permission, because Merit has, is a co-owner of these plans, and we're not working unless Merit has their permission. JCH then represented you. I don't know what you mean by co-owner of the plans. I thought you were saying co-owner of the copyright. Oh, excuse me. You're right. I'm trying to conflict with the language here. I misspoke. Co-owner of the copyrights. I'm sorry. They were co-owner of the copyrights to those plans, and that they would not work with Joseph Carl Holmes unless they got the permission of Merit. But then Joseph Carl Holmes came back and said they wanted to work with Carl. Carl Holmes was the rest of their money. No, that's not what the discussion was between the architects. Because they had done, I don't know, $150,000 worth of work on the plans, and they had only been paid $75,000 or something like that. After Joseph Carl Holmes represented and said you don't need to worry about Merit because Merit, Merit lost the rights or was forfeited the copyrights that they share they formally shared with you in foreclosure. No, they didn't share. But they didn't lose it in foreclosure. That was a misrepresentation. It says here that he retains the ownership and property interest, including the copyright. Excuse me? They didn't share ownership of the copyright, it doesn't look like. They just had a contractual provision regarding how the owner of the copyright, the architect, would proceed. In other words, he couldn't give the identical floor plans to somebody who was developing a subdivision that would be indistinguishable from the original developer's subdivision and its floor plans. And that had all worked out fine, except for one thing, it's the same subdivision and for another, the original developer defaulted. I believe the contract provision says any other entity. Joseph Carl is another entity. They promised they wouldn't work with any other entity, and so that, therefore, that contract provision applies.  Thank you, counsel, for your argument. Okay. I'm sorry. Thanks. May it please the Court. My name is Ray Harris. I represent the defendants in this matter. The Court has already asked questions that touch on three different theories under which we contended in summary judgment that we would be entitled to prevail below. Can I just make sure I understand them? Implied license, which is what the district court relied on, foreclosure, and then getting a license directly from Felton, are those the three theories? Yes, Your Honor. Okay. Are there any other theories besides those that are on the table for us? Well, we've certainly asserted other legal theories. We've asserted that the Merritt Homes did not make a sufficient contribution to the works to constitute coauthorship. But I take it the record before us, I mean, it's just there are disputes or at least it's not fully developed enough on that point for us to rely on that ground. I assume you concede that? No. I think you could affirm on that ground, but I think it's the fourth weakest ground on which to affirm. Counsel, it's summary judgment, isn't it? It is summary judgment. So we can affirm on any ground. It doesn't have to be the district judges. Is that right? That is correct, Your Honor. I had asked some questions about an express license, and the district judge did not go on express license. The district judge went on implied license. Are we or are we not bound to limit our consideration to implied license, or could we also affirm on express license? You could also affirm on express license, Your Honor. I think, however, that the district court judge issued a thorough and well-reasoned opinion with regard to the implied license, and he was correct. Well, he looked on the implied license really as a contractual matter. And it is. And if it is a contractual matter, then I'm wondering if there are factual issues there under that theory that may preclude summary judgment. Is there any record evidence that NBA actually exercised its contractual right in order to effectuate the transfer of the assignment? Well, yes, Your Honor. And what would you rely on for that? Virtually every document in the record. Let me go to a couple that were referred to by counsel for the appellant. With regard to the settlement agreement, there was a settlement agreement and mutual release that was entered into between the parties to the foreclosure to the receivership proceedings in February of 2009. It's Exhibit AA in the record. At AA1, there is a recital in that settlement agreement. Now, keep in mind, this settlement agreement is after the little one-paragraph e-mail that they showed you saying it supersedes all prior negotiations. And it is after the sale from the bank to Brimit, which the bank sold to Brimit, and Brimit sold to my client. In paragraph 2F of the recitals, it says in that settlement agreement, Honor about November 21, 2008, NBA completed a valid deed of trust sale of the real property and collateral, commonly known as Arbolita Ranch, and was the highest bidder at the sale. It then goes on to say in paragraph 3.1 that the recitals are incorporated herein and the parties represent the foregoing recitals are true and correct. So there's a place where you can look to see that the bank certainly thought, and the other parties to this litigation agreed, that there had been a sale of the foreclosure. Well, the problem, if we're going to talk about the foreclosure theory, I mean, the glaring problem is that the notice of the sale didn't specify that it was going to include the collateral. And I just don't see how you could have a valid sale when you're supposedly inviting the public to bid against the bank if the public wasn't informed that, hey, not only are you going to get the real property, you're also going to get all these approved plans, specifications, permits, and the like. It seems to me you couldn't have a valid sale of both the real property and the collateral, as we're defining it, unless the notice at least specified that, right? What's your response to that? My response to that, Your Honor, is under Article 9 of the UCC, the 479610, which I think is in the record and may have been mentioned in questioning of my opposing counsel, after default, a secured party may sell, license, I'm sorry, lease, license or otherwise dispose of any or all of the collateral. Well, I'm not disputing that it could have, that the sale could have included that. I'm just saying that the notice, you have to concede, the notice, if we look at it, it does not say anything other than the real property being, is being sold. Yes. I concede that. Okay. So all I'm saying is that let's say the real property is worth X amount without the plan specifications, all the collateral, right? But with it, it's worth much more. I just don't see how a sale where the public is being informed this is the only item of property that's being sold and the bank says, great, I'll bid X amount. Well, everyone else might have said, well, geez, it's not, that property is not worth that much because all we'd be getting is the property. You'd have to have noticed that it was coming with all this other stuff just for the sale, the trustee sale, to be valid. That's what I would assume. But do you have some authority that says otherwise? Your Honor, the documents in this case serve two purposes. They create a security agreement in all of the collateral. The receiver took possession of all that collateral. There was an acknowledgment that the real property and collateral was disposed of, and when you look at the next event, it was a sale from the bank to Bremen. I don't think there's any question that you can certainly have some language and some documents that you can point to in your favor, but I'm not sure that the acquiring the license through foreclosure is really your best theory because of the conflicting evidence in the record. We're talking about summary judgment, right? And as the questioning reflects the notice of trustee sale, trustee's deed, receiver's final accounting report, they really don't mention the plan. So the issue in my mind is whether those are factual disputes that would preclude summary judgment if we were to go with that, the license through foreclosure theory. I think there might be some other theories that we'll have to explore in this case as well. Well, can I ask you about one of the other theories, the implied license theory? My understanding is this, and this would – this is why I don't think the district court could be right to rely on it. I thought that the bank at the most could have acquired a non-exclusive license, right, as part of the transaction with Merritt and with Arbolda. And if that's true, I thought the law was crystal clear that a non-exclusive licensee doesn't have the legal authority to transfer that to anybody, period, just as a matter of law. So forget about, you know, all of the discussion we had with your opponent here. Just as a legal matter, the district court's theory is defective. What am I missing on that front? I do not believe that I'm aware of the case law you're thinking of, Your Honor. A license is a contractual right. If it's supported by consideration, which it was in this case, it's irrevocable. The issue then becomes the scope of the license. Here – Now, just to be clear, the law I'm talking about is copyright specific. I'm not talking about general law. I'm just saying as a matter of copyright law, a non-exclusive licensee has no authority to transfer that to anybody else. That's my understanding of the law. So are you – you have authority that says otherwise? I haven't researched that issue, but I'm not aware of any authority that would impose that limitation. That contractual right, whether it's in copyright law or elsewhere, can be treated just like any other contract. The rights can be assigned. There can be a third-party beneficiary. I think both of those theories apply here. There was assignment of those license rights from merit, which had entered into the permits and undertook to develop the project, and the related entity that did the construction of the three homes out of the 31 lots. There was an implied license there. There was a loan transaction in order to make all this happen. And in that loan transaction, there are multiple documents that say all of these by the lender or its successor or assigned. Counsel, some of the pages are really hard to read because the Xeroxing was bad. There were some paragraphs I couldn't read because the machine was apparently low on toner. And you probably have exactly what I need with yellow stickies on it right there in front of you. So why don't you tell me where to look in the excerpts of record or supplemental excerpts to get exactly where and with what words the bank foreclosed on or its security interest or otherwise stepped into the shoes of Merit Homes on the plans and then transferred its the license to use the plans to Joseph Carl Holmes's predecessor? Well, let me start first with the transfer because I know where that is. In the purchase and sale agreement, it is excerpt of record U1 and U12. There's a sale from National Bank of Arizona to Brimit Roman numeral II that includes the personal property on Exhibit B, and Exhibit B at U12 lists as the first item subdivision improvement plans, house plans. Now, we are not claiming ownership of the copyright. A lot of discussion by opposing counsel is focused on Merit Homes, the copyright. Okay. So U1, U12, and B12 show that that's the bank's transfer of the plans to Joseph Holmes's predecessor in interest. Correct. Is that right? Okay. Now, where, what should I look at to know that the bank foreclosed on its security interest or otherwise stepped into the shoes of Merit Homes on the plans? I don't think you have to find that the foreclosure was proper. The way that they That's why, that's why I used the phrase after the word or. Yes. The way that the bank stepped into the rights was in the construction document, in the deed of trust, and in the construction management document. They all recite. Could you tell me where, what words to look at on what pages? Or if you have a tab, I don't want you just rummaging through. But I thought if you've got more tabs than me, I want to have the benefit. In the construction plans, I'm sorry. In the, in the construction loan agreement, which is excerpt of record DD, there's a provision at DD 54. It's paragraph 49B, Roman numeral 3. Lender may use the plans and specifications for any purpose relating to the improvements. It doesn't require foreclosure. It requires default. And default is undisputed here. There's no doubt that the bank was not paid. The second document, the construction deed of trust, has a similar provision. Upon default, the beneficiary, the lender, the bank, and the beneficiary's successors and assigns may use the plans and specifications to be used in the actual construction of the improvements. That's excerpt of record CC at 14 and 15. It's paragraph 7 capital A, small a, Roman numeral 7, and B and C. So the theory of implied license then under the CC, that exhibit, can go to the bank's successors and assigns in order to complete the project? Correct. That was the scope of the license was to construct the project. It wasn't limited to construction of the project by Merritt Homes. In fact, Merritt Homes wasn't constructing the project. Arbolita Ranch, a related entity, was constructing the project. The license that they had, as evidenced by all of the contemporaneous documents, was that the project could be completed using the plans if there was a default by the lender or its successors or assigns. And it's clear in this record that we were a successor. If I understand the structure of the deal as you've just clarified, the deal is they don't have to wait for foreclosure to use the plans, I would imagine, as a practical matter, banks wouldn't want to have to wait, because a partly built development is likely to deteriorate from weather and vandals if they don't proceed rapidly after a default. Instead, and they don't need notice because they're not foreclosing, they're exercising a right they already have to use the plans. Upon default, correct. It's a contractual right. It's not a team type of right. It's just a condition precedent to a right they already have under contract. Default is the condition precedent. No foreclosure or other transfer needed. Is that correct? That's correct. And when you look at all the documents in this transaction, they all either support that theory or are silent with regard to that theory. Nowhere ever did Merritt Homes make a claim to be able to impede my client's completion of the project until after it was under way. All right. Thank you. We've taken you over your time. Is there any time left on the clock? Go ahead, counsel. Just two quick points. Somehow Oh, just a minute. Actually, it's over. Let's put a minute on the clock. Somehow the bank has to acquire the rights, the plans, and the bank can't do that by private sale to itself. That's Arizona 47-9610. A secured party may purchase collateral at private sale. What's the matter with your adversary's argument that they already have the right under contract and there's just a condition precedent? They have the right to complete construction, but they still need to foreclose the collateral. Otherwise, they would bypass Article 9, which is not allowed. Why do they need anything but the right, which they have under contract? They had the right to do it, but then in order to execute that right, you have to have an agreement with the copyrights and the other collaterals that are associated with that. So they had the right to do it, but they didn't perfect that. What they elected to do was settle. But going back to my point, they couldn't have acquired it by private sale. The bank couldn't have sold it to itself, and they can't sell it to Arboleda Ranch because under 47-9613, you have to provide notice. At the bottom, it says provide the minimum required for a private disposition. They didn't announce this to anybody, apparently. They just sold it. We will sell or lease it, and then you have to describe the collateral privately sometime after the day and date. You are entitled to an accounting of the unpaid indebtedness secured by the property that we intend to sell. You may request an accounting. That never occurred. That is required under Article 9. They can't bypass that just because they have a right to complete construction. Thank you, counsel. Very complicated issues in this case. We appreciate your arguments. Merit Holmes v. Joseph Carl Holmes is submitted for decision.
judges: Kleinfeld, Nguyen, Watford